**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **SMARTPHONE TECHNOLOGIES LLC,** | § § § | **NO. 6:12cv245 LED-JDL** |
| **v.** | § § | |
| **HUAWEI DEVICES USA, INC., et al.** | § | |

| | | |
|---|---|---|
| **SMARTPHONE TECHNOLOGIES LLC,** | § § § | **NO. 6:12cv350 LED-JDL** |
| **v.** | § § | |
| **ZTE CORPORATION, et al.** | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction opinion construes the disputed claim terms in U.S. Patent Nos. 6,173,316 ("the '316 patent") and 6,466,236 ("the '236 patent"). Plaintiff SmartPhone Technologies LLC ("SmartPhone") alleges Defendants Huawei Device USA Inc., Futurewei Technologies, Inc., ZTE Corporation, ZTE (USA), Inc., and ZTE Solutions, Inc. (collectively, "Defendants") infringe the patents-in-suit. The parties have presented their claim construction positions (No. 6:12cv245, Doc. Nos. 145, 149 & 152; No. 6:12cv350, Doc. Nos. 57, 59 & 62).[1] On May 30, 2013, the Court held a claim construction hearing. For the reasons stated herein, the Court adopts the constructions set forth below.

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381

---

[1] The briefing for the two actions is identical.

F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp.v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v.Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at 1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337,

1343-44 (Fed. Cir. 2001).  This presumption does not arise when the patentee acts as his own lexicographer.  *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc.*, 299 F.3d at 1325.  For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct."  *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583).  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent.  *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."  *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance.  *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir.

2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'")

(citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an

applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d

1372, 1378-79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim

interpretation, prosecution disclaimer promotes the public notice function of the intrinsic

evidence and protects the public's reliance on definitive statements made during prosecution."

*Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative

meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on

the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and

treatises may help the Court understand the underlying technology and the manner in which one

skilled in the art might use claim terms, but such sources may also provide overly broad

definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly,

expert testimony may aid the Court in determining the particular meaning of a term in the

pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim

term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its

prosecution history in determining how to read claim terms." *Id.*

## DISCUSSION

I.      **The '316 Patent**

SmartPhone asserts that Defendants infringe Claims 1-4 of the '316 patent. PLTFF'S

BRIEF AT 6. Claim 1 of the '316 patent is set forth below as representative of the disputed claim

terms (set forth in bold):

1. A computer program product for use on a wireless communication device, the wireless communication device including a memory, a screen display,

a processor for executing the **computer program product**, and controls for operating the wireless communication device, the computer program product comprising:

a **shell** for receiving a **URL** having a protocol component and a data component, the data specifying a command to be executed or content to be fetched, the shell providing the data component to a protocol handler according to the protocol component, and the fetched content to a content handler for processing;

a plurality of protocol handlers, each **protocol handler** communicatively coupled to the shell to receive a URL and either fetch content specified by the data component and provide the fetched content to the shell, or execute the command specified by the data component; and

a plurality of content handlers, each **content handler** communicatively coupled to the shell to receive fetched content and process the fetched content to output the content to the screen display of the wireless communication device.

'316 patent at 59:36-58 (Claim 1).

The '316 patent is directed to a "[s]ystem, method, and software product provid[ing] a wireless communications device with a markup language based man-machine interface [MMI]. The [MMI] provides a user interface for the various telecommunications functionalit[ies] of the wireless communications device." '316 patent, ABSTRACT.

a. **"shell"**[2]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| software that facilitates communication between the protocol handlers and content handlers | software module for maintaining universal parts of the screen display, processing URLs, maintaining a history stack of URLs, and routing user input |

Two issues govern the parties' dispute regarding the term "shell." In particular, Defendants contend a shell is a software module, whereas SmartPhone maintains a shell is simply software. PLTFF'S BRIEF AT 9-10; RESPONSE AT 10. Further, the parties dispute the exact

---

[2] This term is contained in Claims 1-4.

functionality of the shell.  SmartPhone argues that Defendants inappropriately import functional limitations from the specification into the claim.  PLTFF'S BRIEF AT 10.  Defendants, however, state that the specification explicitly describes how the shell operates; Defendants' proposed construction simply clarifies the shell's function based on the written description.  RESPONSE AT 14-15 (citing '316 patent at 11:11-15; 15:11-16; 55:48-50).

### 1. Functionality

"The claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115).  While the claims must be read in light of the specification, the disclosures within the specification do not overcome the "bedrock principle" that the claims, not the written description, define the invention.  *Id.* at 1312, 1315, 1327 (holding that a baffle may be at a right angle despite no such disclosure in the specification).  To do otherwise would be to improperly import a limitation from the specification into the claims.

SmartPhone argues that Defendants unnecessarily import the following limitations from the specification: (1) "maintaining universal parts of the screen display," (2) "processing URLs", (3) "maintaining a history stack of URLs," and (4) "routing user input."  PLTFF'S BRIEF AT 10.  The Court agrees.  While the limitations Defendants propose are disclosed within the specification, the claim language does not recite such functional limitations:

> a shell for receiving a URL having a protocol component and a data component, the data specifying a command to be executed or content to be fetched, the shell providing the data component to a protocol handler according to the protocol component, and the fetched content to a content handler for processing;

'316 patent at 59:42-48.  The relevant portion of Claim 1 recites the functions of the shell: (1) receiving a URL; (2) providing the data component to a protocol handler; and (3) providing

fetched content to a content handler. Beyond these functional limitations, Claim 1 does not require that the shell have additional functionalities. Therefore, the Court declines to add further functional requirements.

For the same reasons, SmartPhone's proposed construction is also incorrect. SmartPhone's proposal attempts to describe the function of the shell in terms of its relationship with the protocol handlers and the content handlers. However, as stated above, the claim language adequately describes the functions of the shell. Because SmartPhone's proposal does not accurately reflect the claim language, the Court also declines to adopt SmartPhone's proposed construction.

### 2. Module

Defendants maintain that the shell is a separate software module because the claim language reflects three separate components: a shell, protocol handlers, and content handlers. RESPONSE AT 10. Further, the claims state that the shell is "communicatively coupled" to the protocol handlers and content handlers, indicating that all three components are separate, discrete structures. *Id.* at 11. According to Defendants, "communicatively coupled" implies a particular structural relationship where the components are necessarily distinct, i.e., modular. *Id.* Moreover, Defendants maintain the shell must be a separate component because the claim requires that the shell communicate with the protocol handlers and content handlers; it would be nonsensical to have the shell communicate with itself. *Id.* at 11.

Defendants' arguments are unpersuasive. The shell, content handlers, and protocol handlers are not required to be distinct, discrete structures simply because the claim discloses separate limitations. Moreover, the claim does not explicitly require that these components be separate modules. While the specification states that "the browser 107 includes three major

pieces: shell 106, protocol handlers 112, and content handlers 114," depicted in Figure 3, '316 patent at 11:7-10, the specification simply addresses a preferred embodiment. In addition, this particular language does not expressly limit the "pieces" to separate modules. Thus, the disclosure is not limiting, as Defendants contend. *See Arlington Industries, Inc. v. Bridge Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.") (internal citations omitted); *Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). While separate architecture for the shell, content handlers, and protocol handlers may be a preferred embodiment, the claim language does not require anything more than that the shell be "communicatively coupled" to both the protocol handlers and content handlers. *See id.* at 59:48-49; 59:54-55.

In sum, the shell is not necessarily modular, nor is it required to perform functions beyond those disclosed in the claim. Having resolved the parties claim scope dispute, the Court finds that no construction is necessary. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

  **b. "URL"[3]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning. No construction necessary. | a Uniform Resource Locator that takes the form protocol:data-identifier[?arguments], where the portion before the colon is the protocol component and the portion after the colon is the data component |

Defendants contend that the patentee acted as his or her own lexicographer, defining the meaning and format of "URL." RESPONSE AT 19. Defendants argue that in the context of the

---

[3] This term is contained in Claims 1-3.

patent, the patentee defined a particular format for a URL, and further, the URL specifies the protocol and data item to be used. *Id.* (citing '316 patent at 10:50-11:6; 16:23-27). SmartPhone, on the other hand, contends that the claim language sufficiently describes a URL, and therefore, the term need not be defined. Pltff's Brief at 16.

Both parties agree that "[a] URL is a data item specifying a protocol for obtaining a data item, and which data item should be fetched or manipulated." '316 patent at 4:14-16. However, neither proffers such a construction. Rather, the parties quibble about whether the URL has a particular meaning in the context of the '316 patent or whether the term requires construction at all.

"To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1356 (Fed. Cir. 2002)). Moreover, the patentee must "clearly express intent" to redefine the term. *Id.* (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

Defendants cite to a portion of the specification to support their proposed construction. While the specification lends credence to Defendants' proposal, the specification does not exhibit a clear intent that the patentee acted as his or her own lexicographer:

> Most of the features of the user interface are activated by means of a URL (Universal Resource Locator). Nominally, a URL is a means of identifying a piece of data, which data may be predefined, or may be generated on demand based on arguments that are encoded in the URL. A URL is a string that takes the following form:
> protocol:data-identifier[?arguments]
> The protocol component specifies a communication protocol that should be used to retrieve the data. For content located on the World Wide Web, the protocol is usually "http" for the HyperText Transport Protocol; local content of the user interface definition files 104 is retrieved with the "file" protocol to obtain

data in a local file system stored in the memory 126. The present invention provides a number of additional new protocols that control the operation and configuration of the wireless communication device 100.

The data-identifier component is a specification of the desired content to be fetched. Currently, for content on the World Wide Web, the data-identifier normally takes the form of two '/' characters, followed by a machine name, another '/' character, and a path of some sort.

The arguments, if present, are separated from the data-identifier by a '?' and take the form of pairs made of an argument name and its value. Multiple arguments are separated by an '&' character between the value of one and the name of the next.

'316 patent at 10:50-11:6. While the cited portion above provides a particular URL format— protocol:data-identifier[?arguments]—it does not clearly state that the URL shall be so limited. The specification is at best, ambiguous, disclosing the typical World Wide Web protocol (http) and data-identifier ('/') and generally stating that a URL contains a protocol and data-identifier. These statements are in accordance with the prior declaration that "[a] URL is a data item specifying a protocol for obtaining a data item, and which data item should be fetched or manipulated." *Id.* at 4:14-16. The portion of the specification cited above provides a specialized URL format, in addition to stating how URLs are currently used to navigate the World Wide Web. These ideas present two seemingly conflicting views that contradict Defendants' argument that the patentee acted as his or her own lexicographer; there is no indication that the patentee clearly expressed intent to redefine the term "URL" to as limited to a particular format.

Moreover, the claim language does not require a particular URL format. Claim 1 of the '316 patent clearly defines the parameters of the URL: ". . . a URL having a protocol component and a data component." '316 patent at 59:42-43. Thus, the claim language simply requires that the URL have a protocol component and a data component; there is no requirement that the URL have a specific format, as Defendants suggest. In addition, Defendants acknowledge that URL has a "well-understood plain and ordinary meaning to persons of ordinary skill in the art."

RESPONSE AT 19. Because (1) the claim language clearly states what the URL must have; (2) the

term is well-known in the art; and (3) the specification does not clearly define the term, "URL"

does not require construction. *See Phillips*, 415 F.3d at 1312-13 (stating that terms are generally

given their "ordinary and customary meaning," which is often the meaning the term would have

to one of skill in the art).

Therefore, the Court finds that no construction is necessary.

### c. "protocol handler"[4] / "content handler"[5]

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| protocol handler | software that can interpret a URL | software module for performing functions related to the protocol component |
| content handler | software that can process content | software module for performing functions for displaying fetched content and managing user interaction |

The disputes concerning "protocol handler" and "content handler" are similar to those

raised with respect to the term "shell." The parties disagree as to whether these components are

modular, and further dispute the exact functions performed by each component. RESPONSE AT

16-17.

Defendants contend the specification describes particular components, such as content

handler 114c and protocol handler 112b, as modules. *Id.* at 12 (citing '316 patent at 50:4-7;

54:33-40). However, such disclosures simply describe preferred embodiments and the Court

declines to import limitations from the disclosure into the claims. *See* SECTION I.a. *supra*; *see*

*also Ventana Medical Sys., Inc. v. Biogenix Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006)

---

[4] This term is contained in Claims 1-4.
[5] This term is contained in Claims 1, 2 & 4.

(citing *Phillips*, 415 F.3d at 1323).  Therefore, the Court finds that the protocol handlers and content handlers are not necessarily modular.

As for the particular functions of the content handler and protocol handler, the required functions are outlined within the claim language:

> a plurality of protocol handlers, each protocol handler communicatively coupled to the shell to receive a URL and either fetch content specified by the data component and provide the fetched content to the shell, or execute the command specified by the data component; and
> a plurality of content handlers, each content handler communicatively coupled to the shell to receive fetched content and process the fetched content to output the content to the screen display of the wireless communication device.

'316 patent at 59:48-58.  As the relevant portion of Claim 1 cited above recites, a protocol handler is, at minimum, required to (1) receive a URL; (2) fetch content and provide said content to the shell; and (3) execute the specified command.  Similarly, a content handler simply needs to receive and process fetched content, outputting it the display of the device.

With respect to the term "protocol handler," Defendants propose a largely general definition that contradicts the claim language.  Defendants advance a definition that does not aid the jury in understanding what a protocol handler is in the context of the claims, stating that a protocol handler is "a software module for performing a well defined set of functions, each function related to the protocol component."  While Defendants' proposed construction mimics the language of the disclosure, *see* '316 patent at 12:16-20, such a definition does not reflect the language of Claim 1, which defines a protocol component as having the functional capabilities described above, e.g., fetching content and executing the specified command.

In its proposed construction for "content handler," Defendants attempt to incorporate functional limitations described in the specification into the claim term.  Defendants cite to a portion of the specification that describes a content handler as "displaying fetched URL data and

interacting with the user." RESPONSE AT 17 (citing '316 patent at 11:27-28). While the specification sheds light on the claim terms, the disclosure cannot outweigh the claim language. *See Phillips*, 413 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *see also* SECTION I.a *supra*. As noted above, Claim 1 requires the content handlers to receive and process data, outputting said data to the display of the wireless communication device. The claim language makes no mention of "interacting with the user," as Defendants argue.

Just as Defendants' proposed constructions defy the bounds of the claim language, SmartPhone's proposals are at odds with the claim language. SmartPhone's proposals generalize the functions of a content handler and protocol handler without accurately reflecting the functional capabilities outlined in the claims. Therefore, the Court rejects SmartPhone's proposals.

In sum, the parties advance constructions that do not accurately reflect the claim language. In addition, the Court finds that a content handler and protocol handler are not necesssarily modular. Because the Court has resolved the claim scope disputes with regard to "content handler" and "protocol handler," the Court finds that these terms require no construction.

### d. "computer program product"[6]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary.<br><br>Alternatively, "software program for providing a markup language-based user interface." | markup language browser<br><br>Alternatively, "markup language based program for providing a user interface" |

---

[6] This term is contained in Claims 1-4.

The primary dispute concerning "computer program product" concerns Defendants' characterization of the product as a browser. SmartPhone contends that while many of the claims recite a browser, others do not, particularly Claims 1 through 4. PLTFF'S BRIEF AT 7. SmartPhone further maintains that a browser is a preferred embodiment; the specification not only broadly describes the invention as a software product, but the patentee amended Claims 1 through 5 to recite both a "computer program product" and "browser program product" to draw a distinction between the two. *Id.* Moreover, SmartPhone argues that defining a computer program product as a markup language browser will confuse the trier of fact; not only does the ordinary meaning of browser connote an internet browser program—which is not what is claimed as the invention of the '316 patent—but Defendants' proposal may also lead the layperson to believe that the browser program itself (as opposed to browser pages) must be written in markup language. *Id.* at 8.

Defendants, however, contend that the "present invention includes a markup language browser." RESPONSE AT 5 (citing '316 patent at 4:3-9). According to Defendants, their position is advanced through multiple disclosures within the specification of the computer program product as a markup language browser. *Id.* at 6 (citing e.g., '316 patent, ABSTRACT; 4:61-6:63).

The term "computer program product" seems to be a generic term used to label the type of apparatus claimed. Claim 1 of the '316 patent claims a computer program product and goes on to provide parameters for such a product, stating that it comprises a shell, a plurality of protocol handlers, and a plurality of content handlers. '316 patent at 59:36-58. Thus, the claim language provides context for a computer program product, sufficiently defining the term. Further, it is important to note that the language of Claim 1 is silent regarding markup language.

In addition, there is a presumption that a computer program product is not a browser program. Claims 8 and 11 recite "[a] browser program product," while Claim 1 recites "a computer program product." *Compare* '316 patent Claims 8 & 11, *with* Claim 1. Because different claim terms are presumed to mean different things, it would be inappropriate to define a computer program product as a browser; to do so would render the term "computer program product" superfluous. *See Digital-Vending Services Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.") (internal citations omitted); *Innova/Pure Water, Inc.*, 381 F.3d at 1119 ("[A]ll claim terms are presumed to having meaning in a claim.").

In addition, the specification broadly describes the patented invention as a software product. *See e.g.*, '316 patent, ABSTRACT ("A system, method, and software product provide a wireless communications device with a markup language based man-machine interface."); 55:17-20. Therefore, due to the claim language and the specification, the Court declines to limit a computer program product to a markup language browser.

As Defendants point out, the '316 patent is directed to "man-machine interfaces constructed from markup languages." RESPONSE AT 6 (citing 1:7-11). However, of the many portions of the specification Defendants cite to support their proposed construction, none show that a computer program product is a markup language browser. *See id.* Rather, Defendants show that a browser program accesses the MMI, the element that contains markup language: "The man-machine interface provides a user interface . . . which is defined in markup language, such as HTML, and accessed through a browser program." '316 patent, ABSTRACT. Thus, it seems that the MMI, which contains markup language, is an element separate and apart of the

browser program. Therefore, it would be inaccurate to characterize a browser as using markup language. Thus, Defendants' proposed construction is rejected.

Having resolved the issue regarding claim scope, the Court finds no construction is necessary at this time. However, should a claim scope dispute arise, the Court may address such issues at a later date, if necessary.

## I. The '236 Patent

SmartPhone contends that Defendants infringe Claims 1-6 of the '236 patent. *See* PLTFF'S BRIEF AT 19. The '236 patent is directed to "[a] portable, hand-held personal digital assistant . . . for simultaneously depicting multiple calendars on a single display." '236 patent, ABSTRACT. Claim 1 is set forth below, with disputed terms in bold:

> 1. A portable data storage module for simultaneously depicting multiple **calendars** on a single display comprising:
> a portable, hand-held housing including a top face, a bottom face, and a side wall therebetween for defining an interior space;
> an input device situated on the top face of the housing and adapted for allowing input of data;
> a display situated on the top face of the housing and adapted for depicting data;
> memory situated in the interior space of the housing for storing a plurality of calendars each including a plurality of scheduled matters; and
> a controller situated in the interior space of the housing and connected between the input device, the display and the memory, the controller suitable **for simultaneously depicting a plurality of the calendars on the display**.

*Id.* at 8:59-9:8.

### a. "calendar"[7]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| data file for storing matters scheduled at certain dates or times | Plain and ordinary meaning, which is: "a list or table of scheduled events" |

---

[7] This term is contained in Claims 1-6.

Defendants propose that "calendar" has a plain and ordinary meaning and therefore the term should be construed accordingly. RESPONSE AT 22. Defendants cite to a dictionary definition to show that a calendar is ordinarily understood as "a list or table of scheduled events." *Id.* In contrast, SmartPhone contends that the calendar, at minimum, should be construed as a data file because the claim language calls for "memory . . . for storing a plurality of calendars." PLTFF'S BRIEF AT 20 (citing 9:1-2). SmartPhone asserts that because the calendars are stored in memory, the calendar must be a data file. *Id.* In addition, SmartPhone points out that Figure 3C depicts a data structure that includes several calendars stored in databases, further supporting the idea that calendars are data files. *Id.*

SmartPhone's proposed construction unnecessarily limits the term "calendar." The language of Claim 1 indicates that a calendar is a graphical or visual form: "A portable data storage module for simultaneously *depicting* multiple calendars on a single *display* . . . ." '236 patent at 8:59-60 (emphasis added); *see also id.* at 9:6-8. Moreover, the specification discloses that calendars note scheduled events in increments such as hours, days etc. For example, Figure 9B "is an illustration of a user interface display of the present invention showing a pair of calendars in increments of hours along with a marked duration of a scheduled matter." *Id.* at 4:10-12; *see also id.* at 3:8-13 ("[V]arious methods may be employed to display the calendars to allow more effective manipulation. For example, . . . at least one calendar is depicted along with a plurality of icons each corresponding to increments of time, i.e. hours, days, and weeks."); 3:35-36; 8:14-41; FIGS. 9A, 9B, 9E, 9F. In addition, the plain and ordinary meaning of "calendar" comports with the both the specification and the claim language: "2. A table of the months, weeks, and days in at least one year. 3. A schedule of events. 4. An ordered list of

matters to be considered."  THE AMERICAN HERITAGE COLLEGE DICTIONARY 199 (3rd ed. 1997), EX. 7, ATTACHED TO RESPONSE.

In contrast, neither the specification nor the claim language mention that a calendar is a data file.  While the specification discloses that calendars may be stored in databases, such a disclosure does not require that calendars be data files, nor does the specification limit the calendars to data files.  In fact, the portion of the specification on which SmartPhone supports the plain and ordinary meaning of "calendar":

> FIG. 3C is a block diagram illustrating a data structure which facilitates *the display of multiple calendars on a display* 110 of the PDA 100 of FIG. 1.  In order to facilitate handling the various calendars stored within the PDA 100, each of the calendars and *associated scheduled matters* may be stored in separate databases 150.

'236 patent at 6:17-22 (emphasis added).  The cited portion does not state that calendars are data files, despite being stored in databases.  Thus, SmartPhone's proposal is too restrictive.  Defendants' proposal, however, is not only consistent with the specification and claim language, but is also consistent with the act of being stored in a database.  Thus, the Court adopts the broader definition.

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'"  *Medtronic Inc. v. Boston Scientific Corp.*, 695 F.3d 1266, 1275 (Fed. Cir. 2012) (quoting *Phillips*, 415 F.3d at 1312-13).  Because the plain and ordinary meaning of "calendar" comports with the language of the claims and the specification, the Court finds that a "calendar" is "a list or table of scheduled events."

### b.  "simultaneously depicting a plurality of the calendars on the display"[8]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning.  No construction necessary. | showing two or more calendars at the same time on the display, each calendar being shown |

---

[8] This term is contained in Claim 1.

| | in a region of the display separate from any other calendars |
|---|---|

The parties dispute whether the calendars, when simultaneously displayed, must be presented within separate regions of the display. SmartPhone contends Defendants attempt to narrow the claims by requiring "that each calendar be displayed *separate from any other calendars*." P‍LTFF'S B‍RIEF AT 22 (emphasis in original). Further, SmartPhone asserts that the meaning of this term is readily understood and therefore requires no construction. *Id.*

On the other hand, Defendants contend that to simultaneously depict a plurality of calendars on the display, the PDA must show two or more calendars at the same time, with each calendar exhibited in separate regions of the display. R‍ESPONSE AT 26. Defendants point out that the specification, especially Figures 9B and 9E, show a two or more calendars, each calendar with a list of scheduled events, in a separate part of the display. *Id.* at 27. Moreover, Defendants argue that the prosecution history supports the idea that each calendar must be separately displayed.

The embodiments within the specification indicate that when displaying two or more calendars, each calendar is separately displayed. For example, in discussing Figures 9B and 9E, the specification states:



FIG. 9B        FIG. 9E

FIG. 9B [right] shows a pair of calendars displayed simultaneously in a side-by-side relationship and each divided into increments of hours. . . .
FIG. 9E [right] depicts three calendars displayed simultaneously in a side-by-side relationship and each divided into increments of hours. As shown, the sections of each calendar are enlarged to compensate for the smaller areas in which the calendars are fitted.

'236 patent at 8:20-22; 8:35-39; *see also id.* at 3:30-33 ("In use, a size of the sections is altered as a function of a number of the calendars simultaneously depicted so as to allow a sufficient amount of space for depicting the scheduled matters."). The "side-by-side" description of showing multiple calendars supports a reading that when multiple calendars are up on the display, each calendar occupies its own space.

In addition, the prosecution history supports Defendants' position. The Examiner rejected Claims 1-6 of the '236 patent application as unpatentable, in part, due to U.S. Patent No. 6,101,480 ("Conmy"). In response to the Examiner's remarks, the patentee stated:

> *Conmy* fails to teach, hint or suggest simultaneously depicting multiple calendars in a single display. For example, FIGs. 5 through 9 of *Conmy* display a single consolidated dialog box that contains "a result performed by the chairman" (column 8, lines 8-10). Rather than simultaneously displaying multiple calendars, *Conmy* displays only the results in scheduling an event. The results of scheduling an event are based on the calendar information from multiple calendars. *However, using calendar information from multiple calendars for displaying on a single dialog box, as in FIGs. 5 through 9, is not the same as simultaneously depicting multiple calendars in a single display.*

REMARKS AT 3 (emphasis added), U.S. APP. NO. 09/288,744 (APRIL 8, 1999), EX. 9, ATTACHED TO RESPONSE. The patentee's remarks indicate that the patentee considered Conmy to disclose the consolidation of a variety of scheduled events, compiled from multiple calendars, to be displayed within a single calendar/dialog box. The patentee then commented that such a practice differs from "simultaneously depicting multiple calendars in a single display." Thus, the patentee's remarks reflect the intent to display multiple calendars within a single display without consolidating said calendars. Therefore, when displaying multiple calendars, each calendar is shown in a separate region of the display.

Consequently, the term "simultaneously depicting a plurality of the calendars on the display" means "showing two or more calendars at the same time on the display, each calendar being shown in a region of the display separate from any other calendars."

## CONCLUSION

For the foregoing reasons, the court adopts the constructions set forth above

**So ORDERED and SIGNED this 27th day of August, 2013.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE